FILED

2005 Jun-03  PM 05:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

BETTY LOU BAILEY, individually and      )
on behalf of all others similarly situated,   )
                                        )
                Plaintiffs,             )
                                        )
vs.                                     )        Case No. 7:04-cv-2162-TMP
                                        )
CUMBERLAND CASUALTY & SURETY            )
COMPANY, DORINCO REINSURANCE            )
COMPANY, JOSEPH M. WILLIAMS,            )
CAROL S. BLACK, and FERNANDO RUIZ,      )
                                        )
                Defendants.             )


## MEMORANDUM OPINION

The court has before it the motions to dismiss filed by defendants Cumberland Casualty &

Surety Company ("Cumberland"), Joseph M. Williams, and Carol S. Black, and by Dorinco

Reinsurance Company ("Dorinco") and Fernando Ruiz.  Both motions were filed on December 21,

2004.  The motions have been fully briefed by the parties, and the court has heard oral arguments

on them.  The parties have consented to the exercise of dispositive jurisdiction by the undersigned

pursuant to 28 U.S.C. § 636(c).  See Doc. 32.


## The Allegations of the Complaint

Because this is before the court on motions to dismiss, the court must accept the well-pleaded

factual allegations of the complaint as true, giving to the plaintiff the benefit of all reasonable

inferences that can be drawn from those allegations.  Bryant v. Avado Brands, Inc., 187 F.3d 1271,

1274 n. 1 (11th Cir. 1999) ("At the motion to dismiss stage, all well-pleaded facts are accepted as

true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff."); Hawthorne v. Mac Adjustment, Inc., 140 F.3d 1367, 1370 (11th Cir. 1998). "A complaint should be dismissed only if it appears beyond doubt that the plaintiffs can prove no set of facts which would entitle them to relief." La Grasta v. First Union Securities, Inc., 358 F.3d 840, 845 (11th Cir. 2004); see also Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957). Nevertheless, to be "well-pleaded," certain allegations must be pleaded with specific factual support and particularity. For example, allegations of fraud must comply with the particularity requirement of Rule 9 of the Federal Rules of Civil Procedure, and allegations of conspiracy cannot be merely conclusory, but must be supported by pleadings of specific facts from which the existence of a conspiracy can be reasonably inferred. See Fullman v. Graddick, 739 F.2d 553 (11th Cir. 1984). "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." Oxford Asset Management, Ltd. v. Jaharis, 297 F.3d 1182, 1188 (11th Cir. 2002); Fernandez-Montes v. Allied Pilots Association, 987 F.2d 278, 284 (5th Cir.1993). Additionally, a provision of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(2), requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" in order to plead adequately the scienter requirement of a

securities-fraud claim.[1]   The Eleventh Circuit Court of Appeals recently summarized the pleading requirements under the Reform Act, saying:

> Under the PSLRA, a securities fraud complaint must plead fraud with particularity and allege facts giving rise to a strong inference of scienter.  The statute states that the complaint "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed," 15 U.S.C. § 78u-4(b)(1), and "shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2).

Phillips v. Scientific-Atlanta, Inc., 374 F.3d 1015, 1016-17 (11th Cir. 2004).

With these standards in mind, the allegations of the plaintiff's First Amended Class Action Complaint can be stated as follows.  In the mid-1990s, a man by the name of Bernard Koyen developed the idea for an insured investment program.  In 1994, Koyen started a company called IGIC Management Company for the purpose of marketing the idea to insurance companies.  In 1995, Koyen contacted Cumberland, and together Cumberland and IGIC developed the Insured Risk

---

[1]    In this circuit, the plaintiff in a securities-fraud case must plead and prove that the defendant acted with "severe recklessness" in making the statements and representations that were allegedly fraudulent.  "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  McDonald v. Alan Bush Brokerage Co., 863 F.2d 809, 814 (11th Cir. 1989)(quoting Broad v. Rockwell International Corp., 642 F.2d at 961-62 (5th Cir. 1981)(en banc)); see also Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1282 n. 18 (11th Cir. 1999).  "The form of recklessness recognized in the well-established case law at the time of passage of the Reform Act was a 'stringent formulation of the term "recklessness" that does not allow for recklessness as a form of negligence.'"  Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1284 n. 21 (11th Cir. 1999)(quoting In re Comshare Sec. Litig., 183 F.3d 542, 550 (6th Cir. 1999)).  Further, "scienter must be found with respect to each defendant and with respect to each alleged violation of the statute."  Phillips v. Scientific-Atlanta, Inc., 374 F.3d 1015, 1017-18 (11th Cir. 2004).

Management Program.  Until that time, Cumberland's primary insurance business was in issuing construction and surety bonds, and it lacked any significant experience or expertise in market investment.  Koyen's company, IGIC, became Cumberland's general agent for marketing the Insured Risk Management Program to brokers and investment advisors around the country.  Koyen also arranged for Dorinco to reinsure a portion of Cumberland's insurance exposure.[2]  Cumberland and Dorinco, as part of the insurance-underwriting process of the Insured Risk Management Program, reviewed and approved detailed sets of investing and trading protocols developed by investment advisors.[3]  By at least 1996, IGIC, as general agent for Cumberland, began marketing the Insured

---

[2]     Plaintiff explicitly alleges that Cumberland and Dorinco were "general partners" with respect to the Insured Risk Management Program, but has offered no factual allegations to support that conclusion of law.  The court finds that the allegation of a general partnership between Cumberland and Dorinco is not "well-pleaded."

[3]     The court has read the depositions of Edward J. Edenfield, the president of Cumberland, and Bernard Koyen, taken by a representative of the Securities and Exchange Commission, and which are attached to the plaintiff's reply brief (Doc. 32).  These depositions describe technical trading protocols developed by the individual investment advisors, but approved by Cumberland and Koyen's company, IGIC, as part of the underwriting process.  The insured investment advisors were "market timers," who traded in and out of mutual funds based on buy and sell signals produced by mathematical formulae that attempted to predict the movement of the stock market.  Under these "timing" programs, trading was dictated entirely by objective criteria and data plugged into a mathematical formula that produced a "signal" either to buy or sell.  To be insured, investment advisors were required to follow such technical trading programs strictly, not deviating from the buy and sell signals produced by operation of the mathematical formula.

The First Amended Class Action Complaint vacillates on the critical factual issue relating to Cumberland's role in the development of these trading protocols.  At ¶ 14, it is alleged that "Cumberland and Dorinco obtained and tested a copy of each investment advisor's 'training program' prior to approving each advisor's participation in the Insured Risk Management Program."  Yet, at ¶ 29, it alleges that "Defendants Cumberland and Dorinco, as insurers, set forth, in their agreement with AIM (and on information and belief all other Co-Conspirator investment advisors) and as part and parcel of the insurance policy, a detailed prescription for the trading methods Aim and the other Co-Conspirator investment advisors were to use in managing investors' money.  On information and belief, these guidelines were in fact created by Cumberland and Dorinco."

Based on the more factually specific allegation in ¶14, the court reads the complaint as alleging that the investment advisors developed their own separate investing protocols, which were

4

Risk Management Program to registered investment advisors, including to the firm of Associated Investment Management, Inc., ("AIM") of Omaha, Nebraska, who in turn made the program available to its investment clients.  The Insured Risk Management Program provided insurance coverage to investment advisors  for losses of principal suffered by their clients for which the advisors may be responsible.  The insurance explicitly ran only to the investment advisor, not the investor-client of the advisor.  In marketing the Insured Risk Management Program, Cumberland and Dorinco produced a Certificate of Endorsement which they understood would be used by investment advisors to show their clients that insurance coverage existed on their investment accounts.

In the fall of 1998, plaintiff Bailey was contacted by an investment advisor, Mike Howard of Aragon Financial Services, Inc., in Tuscaloosa, Alabama, who had been recruited by AIM to "solicit" clients for the Insured Risk Management Program.  Howard told Bailey that he could offer her an investment that would allow her to participate in all the upside of the market while insuring her principal against loss if her investment remained in the Insured Risk Management Program for five years.  Howard gave Bailey a Certificate of Endorsement, created by Cumberland and Dorinco, and other documents that "indicated that AIM would manage [her] capital by trading in and out of no-load mutual funds invested in equities."[4]  The Certificate of Endorsement "indicate[d] that one hundred per cent (100%) of principal would be insured against any losses incurred, provided the plaintiff agreed to leave her investment in the Program for at least five years."[5]

_____

reviewed and approved by Cumberland as part of its underwriting process.

[4]     First Amended Class Action Complaint, ¶ 20.

[5]     First Amended Class Action Complaint, ¶ 20.

The First Amended Class Action Complaint alleges the following misstatements or omissions:

- "Defendants failed to disclose the true terms of the Program ...."

- "Defendants falsely asserted to Plaintiff ... that [she] would bear no risk of loss in the Program if [she] kept [her] investment capital in the program for five years."

- "Defendants failed to reveal that inadequate reserves existed to reimburse Plaintiff ... in the event [her] account declined."

- "Defendants failed to disclose that the Program included no plans and procedures to mitigate losses in the accounts of Plaintiff ...."

- "Defendants falsely informed Plaintiff ... that, should [her] accounts decline by ten per cent (10%), [her] invested funds would be placed in no-risk money-market funds."

- "Defendants failed to disclose that regulators in California had concluded that the Program was a security."

- "Defendants failed to disclose the agency relationship between IGIC and Cumberland and Dorinco and the role Koyen and IGIC played in the creation of the Program, in the selection of investment advisors, in establishing the criteria for those advisors' management of the investment funds of Plaintiff ..., in monitoring the advisors' management of the investment funds of Plaintiff ..., and in monitoring Class Members' account values."

- "Defendants failed to disclose to Plaintiff ... that Defendants had become aware of, had become concerned about, and had communicated with their investment advisors about declining values in Class Members' individual accounts early during the year 2000."

- "Defendants failed to disclose that corporate officers of Cumberland and Dorinco had no expertise in the securities market and possessed no knowledge, academic or otherwise, that would have enabled them to evaluate their investment advisors' investment programs and track records."

- "Defendants failed to inform Plaintiff ... that Defendants' policy of allowing Class Members to "upgrade" or "roll up" their accounts in sharply rising markets dramatically increased the risk that defendants would experience losses greater then

[sic] originally anticipated and that Defendants would not be able to cover such losses."

- "Defendants failed to inform Plaintiff ... of the substantial risks involved in investing in high-risk, aggressive-growth mutual funds of of [sic] the likelihood that the large market gains of the 1990s were unsustainable."

The First Amended Class Action Complaint does not describe how, when, or by whom these representations or omissions were made to plaintiff Bailey. It alleges that Howard was the only person who had direct contact with the plaintiff.

Before Howard met with Bailey, Cumberland and Dorinco knew at that time that AIM was not following the investment protocols mandated by the Insured Risk Management Program,[6] and, consequently, both Cumberland and Dorinco believed that they could cancel the insurance coverage in the program at any time. Neither AIM's failure to follow investment protocols nor the ability to cancel insurance coverage was disclosed to the plaintiff.

On October 16, 1998, plaintiff invested $44,625.82 in an Insured Warranty Account with Howard, Aragon, and/or AIM.[7] Almost a year later, on October 6, 1999, plaintiff received a letter from AIM informing her that she could "upgrade" her account by "rolling up" the profits she had realized in the preceding year, adding those profits to the principal investment in the account. The

---

[6]      At ¶26 of the First Amended Class Action Complaint, plaintiff alleges explicitly that Cumberland and Dorinco "knew" that the investment protocols were not being followed by AIM, but at ¶ 30, she alleges that AIM's failure to follow protocols was "fully known *or reasonably discoverable* by Cumberland and Dorinco...." (Emphasis added). Because the court is required to read the complaint most favorably for the plaintiff, the court will assume that Cumberland and Dorinco had actual knowledge of AIM's failure to follow investing protocols.

[7]      Although the First Amended Class Action Complaint identifies the number of the account, it does not identify what entity actually managed the account. The court infers that either Howard, Aragon, or AIM did so. There is no allegation that the investment was made with Cumberland or Dorinco, or that Cumberland or Dorinco actively managed Bailey's investment.

7

AIM letter advised that this would allow her to gain "additional protection" for her gains and would extend the maturity date to five years from the date of the "upgrade."  In reliance on the letter, plaintiff did "roll" her gains into the account on October 16, 1999, increasing the principal of her investment to more than $48,000.  Cumberland and Dorinco knew at the time of the October 6, 1999, letter from AIM that AIM was not following the investment protocols mandated by the Insured Risk Management Program and, consequently, both Cumberland and Dorinco believed that they could cancel the insurance coverage in the program at any time.  Once again, neither AIM's failure to follow investment protocols nor Cumberland's option to cancel insurance coverage for that reason was disclosed to the plaintiff in the letter.

In 2000, the stock-market boom of the 1990s came to a halt.  Losses in investment accounts began to mount, and by April 2001, Cumberland and Dorinco were aware that there were not enough reserves to cover the losses insured by the Insured Risk Management Program.  In April 2001, Cumberland and Dorinco canceled AIM's insurance coverage under the plan.  In May 2001, Cumberland sent a letter to all insured investment advisors reminding them that they were obligated to inform Cumberland of any investment account that had lost more than 10% of its insured value.  Also by no later than May 2001, AIM and/or Howard notified Bailey that insurance coverage of her investment account had been canceled by Cumberland and Dorinco, but further advised her that AIM believed the cancellation to be wrongful and that it was continuing to pursue its options to have the insurance reinstated or replaced.  There is no allegation that these communications to Bailey came from Cumberland or Dorinco; it is alleged expressly that they came solely from AIM.  Subsequent communications from AIM suggested to Bailey that she remained "bound" by her commitment to keep her investment in the Program for five years, and that if she withdrew her investment early, she

8

would lose the insurance coverage and guaranty of full return of her principal.[8]  By the time Bailey's

five-year anniversary date of October 16, 2004, arrived, virtually her entire investment was lost.

Discussion

The motions to dismiss raise a number of grounds attacking the pleadings in Bailey's

complaint.  In the discussion of those grounds for dismissal, the court makes several observations.

First, it is clear that plaintiff has not sued the persons and entities she dealt with directly — Howard,

Aragon, and AIM.  Rather, her suit is against only Cumberland (and two of its officers) and Dorinco

and its president.  Other than a Certificate of Endorsement created by Cumberland,  plaintiff has not

alleged that she received any statements, representations, or other communications from Cumberland

and Dorinco.  To the extent that she contends that misrepresentations were made to her, or that

omissions made other statements misleading, all of these statements appear to have been made by

sources other than Cumberland and Dorinco.[9]

Next, plaintiff has inadequately alleged any facts from which the existence of a "conspiracy"

involving these defendants on the one hand, and AIM, Howard, or Aragon, on the other, can be

reasonably inferred.  Allegations of conspiracy cannot be merely conclusory, but must be supported

---

[8]      Plaintiff alleges that these communications came from "[her] investment advisors (which Plaintiff believes discovery will show were approved by Defendants Cumberland and Dorinco)...."  In the context of Bailey's investment, this allegation makes little sense as Cumberland already had canceled the insurance coverage for AIM.  It defies common sense that Cumberland and Dorinco, who already had canceled AIM's insurance and who had been threatened by AIM with legal action, would "approve" such communications by AIM to its clients.

[9]      The court acknowledges that plaintiff's complaint alleges that she received "documents" from Howard and AIM, but the only document she alleges she received from Cumberland and/or Dorinco was the Certificate of Endorsement.

9

by facts from which a reasonable fact-finder could infer circumstantially the existence of an

agreement among the alleged conspirators to carry out some illegal objective.  For more than twenty

years, courts have held:

> In conspiracy cases, a defendant must be informed of the nature of the conspiracy
> which is alleged.  It is not enough to simply aver in the complaint that a conspiracy
> existed.  See Ostrer v. Aronwald, 567 F.2d 551 (2d Cir. 1977); United States Ex Rel.
> Simmons v. Zibilich, 542 F.2d 259 (5th Cir. 1976). See also Black v. United States,
> 534 F.2d 524 (2d Cir. 1976); Fine v. City of New York, 529 F.2d 70 (2d Cir. 1975).
> A complaint may justifiably be dismissed because of the conclusory, vague and
> general nature of the allegations of conspiracy. 2A J. Moore & J. Lucas, MOORE'S
> FEDERAL PRACTICE ¶ 8.17[5] at 8- 180, 181 (2 ed. 1984).

Fullman v. Graddick, 739 F.2d 553, 557 (11th Cir. 1984).   In Lombard's, Inc. v. Prince

Manufacturing, Inc., 753 F.2d 974 (11th Cir. 1985), a Sherman Act case in which the court

emphasized that only notice pleading was required, the court of appeals found the complaint to be

insufficient to state a conspiracy claim because no facts supporting the existence of a conspiracy

were pleaded, and "[a] conclusory allegation of conspiracy to restrain trade will not survive a motion

to dismiss."  Id. at 975; see also Brett v. First Federal Savings & Loan Association, 461 F.2d 1155

(5th Cir. 1972) ("Although plaintiffs may be unable to allege specific facts proving actual acts of

agreement or conspiracy, the pleadings are sufficient if they set forth facts from which an inference

of unlawful agreement can be drawn.").

If anything, the higher pleading standards required in private securities-fraud litigation

mandates an even clearer statement of the facts giving rise to an inference of conspiracy.  That is

missing here; there are no facts pleaded indicating that Cumberland and Dorinco reached an

agreement with AIM, Howard, and Aragon to mislead Bailey about the nature of her investment.

Thus, for purposes of analyzing the motions to dismiss, the court will not infer the existence of a "conspiracy" between Cumberland and Dorinco, and AIM, Howard, and Aragon.

I. Federal Securities-Fraud Claim

    A. *Pleading Standards under Rule 9 and the PSLRA*

The first ground raised by the motions to dismiss the court wishes to discuss is whether the complaint adequately pleads a federal securities-fraud claim. Defendants contend that the First Amended Class Action Complaint fails to comply with the "heightened pleadings" standards of either Rule 9 of the Federal Rules of Civil Procedure relating to allegations of fraud, or the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4.

Under the PSLRA, to properly allege a claim under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, a plaintiff must allege "1) a misstatement or omission, 2) of a material fact, 3) made with scienter, 4) on which plaintiff relied, 5) that proximately caused his injury." Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1281 (11th Cir. 1999). As used here, "scienter" means that the misrepresentation or omission was made with "severe recklessness." Id. at 1282. Most importantly, "Section 78u-4(b)(2) expressly requires plaintiffs to 'state *with particularity* facts giving rise to a *strong inference* that the defendant acted with the required state of mind.'" (Emphasis in original quotation). Id. "Severe recklessness" is defined by the courts as follows:

> "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."

Id. at 1282 n. 18 (quoting McDonald v. Alan Bush Brokerage Co., 863 F.2d 809, 814 (11th Cir.

1989), quoting in turn Broad v. Rockwell International Corp., 642 F.2d at 961-62 (5th Cir. 1981)(en

banc)).  It is not enough for the plaintiff to allege merely that the defendant had a motive and

opportunity to commit fraud; instead, she must "must plead with particularity facts which give rise

to a strong inference that the defendant acted in a severely reckless fashion ...."  Bryant v. Avado

Brands, Inc., 187 F.3d 1271, 1285 (11th Cir. 1999).

Recently, the Eleventh Circuit reiterated the pleading requirements for a federal securities

fraud case, as follows:

> Under the PSLRA, a securities fraud complaint must plead fraud with particularity
> and allege facts giving rise to a strong inference of scienter.  The statute states that
> the complaint "shall specify each statement alleged to have been misleading, the
> reason or reasons why the statement is misleading, and, if an allegation regarding the
> statement or omission is made on information and belief, the complaint shall state
> with particularity all facts on which that belief is formed," 15 U.S.C. § 78u-4(b)(1),
> and "shall, with respect to each act or omission alleged to violate this chapter, state
> with particularity facts giving rise to a strong inference that the defendant acted with
> the required state of mind," 15 U.S.C. § 78u-4(b)(2).

Phillips v. Scientific-Atlanta, Inc., 374 F.3d 1015, 1016-17 (11th Cir. 2004).  The court emphasized

that although factual allegations may be aggregated to create the required "strong inference" of

scienter, it must be established for each defendant separately with respect to each alleged

misrepresentation or omission.  The court explained:

> *We hold that scienter must be found with respect to each defendant and with respect*
> *to each alleged violation of the statute.*  The text of the PSLRA requires that
> plaintiffs, "with respect to each act or omission alleged to violate this chapter, state
> with particularity facts giving rise to a strong inference that *the defendant* acted with
> the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added).  We believe
> that the plain meaning of the statutory language compels the conclusion that scienter
> must be alleged with respect to each alleged violation of the statute.  Although the
> plain language is less compelling with respect to alleging the scienter of each

> defendant, the statute does use the singular term "the defendant," and we believe that
> the most plausible reading in light of congressional intent is that a plaintiff, *to*
> *proceed beyond the pleading stage, must allege facts sufficiently demonstrating each*
> *defendant's state of mind regarding his or her alleged violations.*

<u>Phillips v. Scientific-Atlanta, Inc.</u>, 374 F.3d 1015, 1017-18 (11th Cir. 2004) (first and third italics

added for emphasis, second italics in original, footnotes omitted).

Layered on the pleading requirement of the PSLRA are those imposed by Rule 9(b) of the

Federal Rules of Civil Procedure.  In the context of a securities-fraud case, the Eleventh Circuit has

said about Rule 9 pleading the following:

> In order to survive a motion to dismiss, Plaintiffs' claims of fraud under § 10(b) and
> Rule 10b-5 also must satisfy the requirements of Fed.R.Civ.P. 9(b). Rule 9(b)
> provides:
>
>> In all averments of fraud or mistake, the circumstances constituting
>> fraud or mistake shall be stated with particularity. Malice, intent,
>> knowledge, and other condition of mind of a person may be averred
>> generally.
>
> Fed.R.Civ.P. 9(b). "The particularity rule serves an important purpose in fraud
> actions by alerting defendants to the 'precise misconduct with which they are
> charged' and protecting defendants 'against spurious charges of immoral and
> fraudulent behavior.'"  <u>Durham v. Bus. Management Assocs.</u>, 847 F.2d 1505, 1511
> (11th Cir. 1988) (quoting <u>Seville Indus. Mach. Corp. v. Southmost Mach. Corp.</u>, 742
> F.2d 786, 791 (3d Cir. 1984)).  The application of Rule 9(b), however, "must not
> abrogate the concept of notice pleading."  <u>Id.</u>  *Rule 9(b) is satisfied if the complaint*
> *sets forth "(1) precisely what statements were made in what documents or oral*
> *representations or what omissions were made, and (2) the time and place of each*
> *such statement and the person responsible for making (or, in the case of omissions,*
> *not making) same, and (3) the content of such statements and the manner in which*
> *they misled the plaintiff, and (4) what the defendants obtained as a consequence of*
> *the fraud."*  <u>Brooks v. Blue Cross and Blue Shield of Florida, Inc.</u>, 116 F.3d 1364,
> 1371 (11th Cir. 1997) (internal quotation omitted).

<u>Ziemba v. Cascade International, Inc.</u>, 256 F.3d 1194, 1202 (11th Cir. 2001) (italics added for

emphasis).

Melding together the Rule 9(b) standards and the PSLRA requirement that scienter be attributed to *each* defendant with respect to *each* alleged violation of § 10(b), a plaintiff attempting to plead a federal securities-fraud claim grounded on misrepresentations or omissions must allege with respect to *each* defendant and for *each* alleged misrepresentation or omission (1) precisely what the misrepresentation or omission was, (2) what document or oral statement contained the misrepresentation or omission, (3) the time and place of the communication of the statement or document containing the misrepresentation or omission, (4) the person (or entity) responsible for making the statement or omission, (5) the content of the statement or omission, (6) the manner in which the statement or omission misled the plaintiff, (7) and what each defendant obtained as a result of the misrepresentation or omission.

Applying these "heightened pleading standards" to the allegations of the First Amended Class Action Complaint, it is apparent that the complaint fails to plead a federal securities-fraud claim sufficiently to avoid dismissal under Rule 12(b)(6), at least with respect to the defendants named in it.[10]   First, disregarding the inadequate allegations of a conspiracy, the complaint nowhere alleges that Cumberland or Dorinco (or the officers of those corporations) made any statements, written or documentary, to the plaintiff, except for the Certificate of Endorsement delivered to Howard and then given to Bailey by him.  The plaintiff does not allege any facts implying that AIM, Howard, or Aragon was alleged to be acting as agents for Cumberland or Dorinco; consequently, their statements are not attributable to Cumberland or Dorinco.  The complaint has identified the Certificate of Endorsement issued by Cumberland as the only "statement" made at all by Cumberland or Dorinco

---

[10]   Because they are not named as defendants in this case, the court has no opportunity to assess the sufficiency of the pleadings with respect to Howard, Aragon, AIM, IGIC, or Koyen.

to the plaintiff, and it does not attribute any of the alleged misrepresentations or omissions listed at pages 4 and 5 of the First Amended Class Action Complaint to the Certificate of Endorsement. The use of the generic "defendants" in the list of alleged misrepresentations fails to meet the plain requirement of the PSLRA that the complaint allege "scienter ... with respect to *each defendant* and with respect to each alleged violation of the statute." Plaintiff simply fails to allege that any misrepresentation or omission was made to her through any document or statement supplied by Cumberland or Dorinco.

Even if the complaint can be read as suggesting that some document or statement by defendants was communicated to Bailey, it does not allege the "time and place" of the statement or the person or persons who made the statement to her. The precise contents of any statements made by Cumberland and Dorinco are not alleged. Plaintiff must allege the facts that show what statements were made by *each* defendant, the contents of the statements, and when and how they were made. Because these facts are not pleaded "with particularity," the federal § 10(b) and 10b-5 claim must be dismissed.

### B. *Statute of Limitations*

As an alternative basis for dismissal, the court believes the one-year limitation period for plaintiff to assert her securities-fraud claim expired before the complaint was filed.

Prior to the enactment of the Sarbanes-Oxley Act on July 30, 2002, the limitation period for the commencement of an action under § 10(b) and Rule 10b-5 was one year from the date of discovery of the facts constituting the fraud. The Eleventh Circuit Court of Appeals explained in 2001:

> Claims under Section 10(b) of the Exchange Act and Rule 10b-5 must be brought
> "within one year after the discovery of the facts constituting the violation."  Lampf,
> Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364, 111 S. Ct. 2773,
> 115 L. Ed. 2d 321 (1991).  "Discovery occurs when a potential plaintiff has inquiry
> or actual notice of a violation."  Kauthar SDN BHD v. Sternberg, 149 F.3d 659, 670
> (7th Cir. 1998). ...  "Inquiry notice is 'the term used for knowledge of facts that would
> lead a reasonable person to begin investigating the possibility that his legal rights had
> been infringed.'"  Id.

Theoharous v. Fong, 256 F.3d 1219, 1228 (11th Cir. 2001); see also Grippo v. Perazzo, 357 F.3d

1218 (11th Cir. 2004); La Grasta v. First Union Securities, Inc., 358 F.3d 840 (11th Cir. 2004).

Furthermore, "inquiry notice" does not require that the plaintiff be aware of the full extent of the

fraud:

> "Plaintiff need not ... have fully discovered the nature and extent of the fraud before
> [he was] on notice that something may have been amiss.  Inquiry notice is triggered
> by evidence of the *possibility* of fraud, not full exposition of the scam itself."  Sterlin
> v. Biomune Systems, 154 F.3d 1191, 1203 (10th Cir. 1998) (alterations in original)
> (emphasis added).

Theoharous v. Fong, 256 F.3d 1219, 1228 (11th Cir. 2001) (italics in original).

In this case, plaintiff was notified by no later than May 2001 that Cumberland (and Dorinco)

had canceled the insurance coverage she expected to be in place on her investment.  Also by that

date, her investment had lost money.  These events were sufficient facts to alert a reasonable person

to the "possibility" of fraud in the original representations that her investment principal was secured

against loss by insurance.  Certainly, the security of insurance coverage of her principal was the most

important element of the *Insured* Risk Management Program, and the loss of that insurance should

have raised red flags that "something may have been amiss" about the accuracy and completeness

of the representations made to her in 1998 and 1999.  Thus, the one-year limitation period for

plaintiff's § 10(b) claim began to run in May 2001 and expired in May 2002, long before she filed the complaint in this action in 2004.

Plaintiff attempts to meet this argument in two ways: (1) the Sarbanes-Oxley Act extended the limitation period to two years, or up to five years after the alleged misrepresentation occurred, and (2) her claim did not fully accrue until the expiration of her five-year commitment to keep the investment in place in order to retain the insurance guaranty of her principal.   Neither of these arguments, however, overcomes the untimeliness of her complaint.[11]

First, virtually all courts addressing the question have found that the Sarbanes-Oxley Act is not retroactively applicable to *revive* a § 10(b) claim that already had expired prior to the passage of the Act.  See, e.g., Foss v. Bear, Stearns & Co., Inc., 394 F.3d 540, 542 (7th Cir. 2005); Glaser v. Enzo Biochem, Inc., 2005 WL 647745 (4th Cir. March 21, 2005); Enterprise Mortgage Acceptance Co., LLC, Securities Litigation v. Enterprise Mortgage Acceptance Co., 391 F.3d 401, Fed. Sec. L. Rep. ¶ 93,044 (2nd Cir., Dec 6, 2004); Wuliger v. Sewell, 363 F. Supp. 2d 940 (N.D. Ohio 2005); In re Enron Corp. Securities, Derivative & ERISA Litigation, 2004 WL 405886 (S.D. Tex. Feb. 25,

---

[11]     Although not argued at the hearing on the motions to dismiss, plaintiff's brief also suggests that the defendants are estopped from asserting the limitation period as a defense because AIM indicated to plaintiff, after its insurance coverage was canceled in April 2001, that it was seeking to reinstate or replace the coverage.  Plaintiff contends this lulled her into a false security that allowed the limitation period to expire.  While this might implicate the running of the limitation period with respect to claims against AIM (or Howard or Aragon), it does not create any estoppel against the defendants in this case.  There is no allegation that any of these named defendants ever represented or implied to plaintiff that the insurance coverage they canceled would be reinstated or replaced.  There simply is no basis for the suggestion that Cumberland, Dorinco, or any of the named defendants attempted to cover up or mislead the plaintiff about the fact that in April 2001 the insurance coverage they had provided to AIM had been canceled.  Plaintiff's own complaint alleges that, after the cancellation, AIM was in an adversarial position to the defendants, threatening legal action against them due to the cancellation.  AIM certainly was not an "agent" of the defendants at that point.  Thus, AIM's statements to the plaintiff cannot be taken as any attempt by the defendants to lull the plaintiff into allowing the limitation period to expire.

2004); A.I.G. Asian Infrastructure Fund, L.P. v. Bayan Telecommunications Holdings Corp., 2004 WL 3095844 (S.D.N.Y. March 25, 2004); Milano v. Perot Systems Corp., 2004 WL 2360031 (N.D. Tex. Oct 19, 2004); Zouras v. Hallman, 2004 WL 2191034 (D.N.H. Sept.30, 2004); Zurich Capital Markets v. Coglianese, 2004 WL 2191596 (E.D. Ill. Sept. 23, 2004); L-3 Communications Corp. v. Clevenger, 2004 WL 1941248 (E.D. Pa. Aug.31, 2004); In re WorldCom, Inc. Securities Litigation, 2004 WL 1435356 (S.D.N.Y. June 28, 2004); Lieberman v. Cambridge Partners, L.L.C., 2004 WL 1396750 (E.D.Pa. June 21, 2004); In re ADC Telecommunications, Inc., Securities Litigation, 331 F. Supp. 2d 799, 804 (D. Minn. 2004); In re Royal Ahold N.V. Securities & ERISA Litigation, 351 F. Supp. 2d 334, 368 (D. Md. 2004); De la Fuente v. DCI Telecommunications, Inc., 259 F. Supp. 2d 250, 258-59 n. 5 (S.D.N.Y. 2003). But see, Roberts v. Dean Witter Reynolds, Inc., 2003 WL 1936116 (M.D. Fla. Mar. 31, 2003) (holding Sarbanes-Oxley retroactively revives claims time-barred before effective date of the Act). This court agrees with the overwhelming majority of courts that Sarbanes-Oxley cannot be used to revive claims already time barred on the date the Act became effective. Thus, in this case, plaintiff Bailey's § 10(b) and Rule 10b-5 claim became stale in May 2002, and was not revived by the enactment of Sarbanes-Oxley on July 30, 2002.

Even under Sarbanes-Oxley's[12] limitation period of two years, the complaint still is untimely. Although plaintiff focuses on the five-year repose period, the limitation period in the Act is the "earlier of" two-years after discovery of the misrepresentation or five years after the making of the misrepresentation.  See 28 U.S.C. § 1658(b).   For the reasons already discussed, plaintiff is deemed to have "discovered" the violation by no later than May 2001.  Section 1658(b) simply increased the limitation period from one year to two; it did not change the "inquiry notice" standard for triggering the commencement of the limitation period.  Suit in this case was not filed until July 2004, far more than even two years after discovery of the facts that put her on notice to investigate the "possibility" of fraud.  Theoharous v. Fong, 256 F.3d 1219, 1228 (11th Cir. 2001).

Next, plaintiff argues that her § 10(b) claim did not accrue, and thus could not be sued upon, until the five years she was obliged to maintain the investment expired in October 2004.  She contends that, until the five-year investment period expired, she did not know whether the commitment to guarantee her principal against loss would be fulfilled or not.  This contention seems to be grounded on the claim that plaintiff suffered no "loss," an essential element of a fraud claim,

---

[12]  28 U.S.C. § 1658(b) provides:

Notwithstanding subsection(a), a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47)), may be brought not later than the earlier of--

(1)  2 years after the discovery of the facts constituting the violation; or
(2)  5 years after such violation.

until the five-year investment obligation expired and the principal losses in her investment account were not made whole. Thus, she asserts, no fraud claim accrued until October 2004.

There are at least two flaws in this argument. First, it is contrary to her own conduct. Plaintiff filed suit in July 2004, before the October 2004 expiration of the five-year investment obligation, indicating that she believed that her § 10(b) claim had accrued sufficiently to support a lawsuit. Second, it is simply not true that plaintiff was required to live with the five-year investment obligation after it became apparent that misrepresentations had been made to her at the time of the initial and "rolled-up" investments were made. When the insurance coverage of her investment was canceled in 2001, after her investment account already had suffered losses (see ¶¶ 16 and 34 of the First Amended Class Action Complaint), plaintiff had incurred sufficient damage for her claim to accrue. The combination of investment losses and the cancellation of insurance, the central feature of the *Insured* Risk Management Program, were all that was needed to cause the fraud action to accrue, particularly as plaintiff alleges that defendants *never* had any intention of fulfilling their obligations to her (see ¶ 33 of the First Amended Class Action Complaint). It is important to remember that while the investment was made with and managed by Howard, Aragon, and/or AIM, who are not sued in this action, Cumberland and Dorinco were the "insurers" of the Insured Risk Management Program. Although it may have taken until the expiration of the five-year investment obligation to determine if Howard, Aragon, and/or AIM were going to fulfill the guarantee that no principal would be lost, it was crystal clear that Cumberland and Dorinco would not do so when they canceled the insurance coverage in April 2001. Thus, at least with respect to Cumberland's and Dorinco's potential liability, plaintiff's cause of action accrued fully upon the cancellation of the insurance.

20

A third flaw undermines plaintiff's argument on the timing of the accrual of her claim. At the point in time that insurance coverage of her investment account was canceled, plaintiff's obligations under the investment scheme were voided by the breach of the essential term of the agreement — that insurance would secure her investment principal against loss. The loss of that consideration for her agreement to maintain the investment for five years freed her of any obligation to continue with the investment. Furthermore, Bailey had no obligation to leave her investment in a scheme that she now alleges was fraudulent from the beginning. The alleged fraud vitiated any contractual obligations on her part *ab initio*. It would be strange indeed for a plaintiff to contend that she was defrauded into making an investment, but not free to terminate it once she discovered the fraud. The fraud that induced the investment to begin with also voided any contractual obligations she may have had as part of the investment, including the obligation to leave the investment in place for five years. Plaintiff certainly could have elected to terminate her investment in the *Insured* Risk Management Program when the insurance coverage that made it so attractive was canceled, because the investment program was no longer as it was represented to her.

Thus, plaintiff's federal securities-fraud claim under § 10(b) and Rule 10b-5 fully accrued at least by April or May 2001 when the insurance coverage of her investment account was canceled. It was then that she was put on notice of the "possibility" of fraud, and it was then that the one-year limitation period began to run. The limitation expired in May 2002, before either this case was filed or Sarbanes-Oxley extended the limitation period to two years. And, even if Sarbanes-Oxley revived and extended her claim to *two* years after discovery of the facts constituting the fraud, that period expired before suit was filed. Plaintiff's federal claim is simply time-barred.

21

Having concluded that there is no viable cause of action for a primary violation of § 10(b) by either Cumberland or Dorinco, there can be no secondary violation by any of the officers of these two defendants. Consequently, the motions to dismiss by Williams, Black, and Ruiz are due to be granted as well. Moreover, because one of the bases for dismissal of Bailey's claim — expiration of the statute of limitation — cannot be corrected by better or fuller pleading, the dismissal must be with prejudice.

II. <u>Supplemental State-Law Claims</u>

Plaintiff has alleged a number of state-law claims under both Alabama and Florida law the court's jurisdiction over which comes from 28 U.S.C. § 1367, which authorizes a federal court, ordinarily a court of limited jurisdiction, to exercise adjudicative power over state-law claims arising from the same operative facts as the claim grounded on federal jurisdiction. Nonetheless, § 1367(c) grants to the court the discretion not to determine such state-law claims under certain circumstances. The subsection (c) of the statute reads:

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if--

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

Because the court has determined that plaintiff's federal-law claim under § 10(b) must be dismissed with prejudice, § 1367(c)(3) suggests that the court exercise its discretion to reject consideration of the supplemental state-law claims.  There are good jurisprudential reasons for doing so in this case. First, plaintiff's federal-law claim is stale and provides at best only a very slender reed on which to hang federal jurisdiction.  Second, questions concerning the inter-relationship of insurance with investment schemes implicates areas of the law usually reserved to state regulatory power, and should be best decided by state courts under state law.  Whether and to what extent insurance coverage of the type involved here is lawful under state insurance regulatory powers should be left to resolution by each state, not by a federal court with only limited jurisdictional interest in the controversy.  Third, the named plaintiff in this case cannot adequately represent a class of investors due to the staleness of her own claims, and whether a class should be formed should be left to a case in which a more adequate class representative is present.

For these reasons, the court believes that it is best to exercise its discretion under § 1367(c) not to hear and determine the supplemental state-law claims asserted in this case.  Those claims shall be dismissed without prejudice.

## Conclusion

For the reasons discussed above, the court will enter a separate order dismissing with prejudice all of plaintiff's federal claims under § 10(b) and Rule 10b-5, and dismissing without prejudice all state-law claims.

DONE this 3rd day of June, 2005.

_____
T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE